# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

| | | |
|---|---|---|
| | : | Civil Action No. 17-9720 (FLW) |
| SEAN R. KLEIN, | : | |
| | : | **OPINION** |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| NANCY A. BERRYHILL, | : | |
| Acting Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

**WOLFSON, United States District Judge**:

Sean R. Klein ("Mr. Klein" or "Plaintiff"), appeals from the final decision of the Acting Commissioner of Social Security, Nancy A. Berryhill ("Defendant") denying Plaintiff disability benefits under Title II of the Social Security Act (the "Act"). After reviewing the Administrative Record, the Court finds that the Administrative Law Judge's ("ALJ") opinion was based on substantial evidence and, accordingly, the decision is affirmed.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff was born on June 29, 1973, and was 38 years old on the alleged disability onset date of November 9, 2011. Administrative Record 94 (hereinafter "A.R."). Plaintiff has a high school education, and prior to his alleged disability, Plaintiff worked as a produce manager, produce assistant, and in sales. A.R. 101.

On March 15, 2013, Plaintiff applied for social security disability insurance benefits, alleging disability beginning on November 9, 2011. A.R. 326-37. Plaintiff's claims were denied on May 2, 2013, A.R. 117-21, and again upon reconsideration on July 27, 2013. A.R. 123-27. On August 3, 2013, Plaintiff requested a hearing, A.R. 129-30, which was held on October 21,

2014, before ALJ Michal Lissek. A.R. 34-56. A supplemental hearing was also held on May 24, 2016. A.R. 57-92. The ALJ determined that Plaintiff was not disabled and denied his claims for disability insurance benefits. A.R. 18-26. Plaintiff requested review by the Appeals Council, which was denied on September 26, 2017. A.R. 1-4. On October 27, 2017, Plaintiff filed the instant appeal.

### A.    Review of the Medical Evidence

Plaintiff was formerly employed as a produce manager in 2011, and his work responsibilities required him to carry produce crates which weighed between fifty and one hundred pounds, subsequent to which he developed back and neck complications. A.R. 363-64, 609.

On October 11, 2011, Plaintiff complained of low back pain and underwent a physical examination at Sports Extra[1] in Clark, New Jersey, during which the following determinations were made: he had normal gait; he had full muscle strength; he had intact sensation. A.R. 464. However, Plaintiff's left straight leg raising test was positive, and he was ultimately diagnosed with lumbar radiculitis, back pain, and prescribed pain medication. A.R. 464. On October 25, 2011, Plaintiff's lumbar spine MRI revealed a L4-L5 disc bulge with central annular tear effacing the anterior thecal sac, and a L5-S1 grade II spondylolisthesis resulting in pseudobulge contributing to moderate-to-severe bilateral neural foraminal stenosis with contact of the bilateral exiting L5 nerve roots. A.R. 459.

In November 2011, Plaintiff returned to Sports Extra with complaints of lower back pain that radiated down to his toes, starting approximately six months earlier. A.R. 465. Upon examination, Plaintiff had normal gait; he was capable of flexing down to the knee from a

---

[1]    The Court notes that the medical record from Sports Extra are comprised of poorly handwritten and photocopied documents.

standing position; his straight leg raising tests were negative; and he had a full range of motion in his legs. A.R. 465. Plaintiff was diagnosed with lumbar radiculopathy. A.R. 465. Moreover, on November 9, 2011 and November 26, 2011, Plaintiff received two lumbar epidural steroid injections. A.R. 455-57.

On December 22, 2011, Plaintiff returned to Sports Extra, and reported that his pain was "better but still troublesome." A.R. 466. He also indicated that he was unable to work, because his job required him to lift "heavy boxes." A.R. 466. Plaintiff's physical examination revealed that his left straight leg raising test was positive and he had a paraspinal muscle spasm, but he displayed full muscle strength; Plaintiff was assessed with lumbar radiculopathy and pain medication was prescribed. A.R. 466.

On February 13, 2012, Plaintiff underwent a lumbar spine X-ray at the VA Hospital in East Orange, New Jersey, showing grade 1 spondylolisthesis at L5-S1 with bilateral spondylolysis and mild retrolisthesis of L4 in relation to L5. A.R. 477-78. However, there was no evidence of instability in the flexion and extension views, or any acute fractures or dislocations. A.R. 477-78. A lumbar spine MRI was recommended for further evaluation, in order to rule out any intrinsic abnormalities. A.R. 477.

On March 27, 2012, Plaintiff returned to the VA Hospital with complaints of low back pain radiating down to his knees, starting approximately five to six months earlier. A.R. 608-13. Plaintiff reported that the pain decreased whenever he would lie down, but increased whenever he would either sit or walk for more than three hours. A.R. 608. In addition, Plaintiff indicated that percocet and epidural injections helped relieve the pain. A.R. 608. A physical examination revealed as follows: Plaintiff was pleasant; his was not in any apparent distress; he showed decreased lumbar lordosis and forward flexed neck; he had mild lumbar tenderness to palpation;

and he exhibited decreased sensation in his thighs and right big toe. A.R. 608. However, Plaintiff had normal gait; his lumbar spine range of motion was within normal limits, although he experienced pain at the end-range of flexion; his straight leg raising tests were negative; and he was capable of walking on his heels and toes. A.R. 611-12. Plaintiff was provided with the following diagnosis: "low back pain" with "L4-L5 disc bulge w/central annular tear effacing the anterior thecal sac, and L5-Sl grade II spondylolisthesis resulting in pseudobulge contributing to the moderate to severe bilateral neural foraminal stenosis with contact on the bilateral L5 nerve roots." A.R. 612.

In April 2012, during two neurology consultations at the VA Hospital, Plaintiff's facial sensation was intact; he showed no droop; his shoulder shrug was strong and symmetric; he had mostly full muscle strength; and his sensation was mostly intact. A.R. 594. In addition, Plaintiff was oriented in all three spheres; his speech was fluent; he followed commands; and he had normal gait and coordination. A.R. 599-600. Plaintiff was diagnosed with "low back pain and numbness/tingling in his legs," which was likely secondary to lumber disk spondylithosis with radiculopathy." A.R. 600.

On April 24, 2012, during a follow up at the VA Hospital, Plaintiff reported low back pain radiating down to his mid-thigh area and numbness of both big toes. A.R. 590. Plaintiff indicated that his back pain worsens while sitting, although he denied spasms/stiffness in the back, and complained of tingling on the right side of his face, lips, and tongue. A.R. 590. A physical examination revealed that he did not exhibit any facial pain and he had a normal range of motion in his face; however, Plaintiff ambulated slowly; he appeared to be in moderate pain; he had mild stiffness in his neck; he displayed a decreased back range of motion; and his straight leg lifts were painful at 20 degrees. A.R. 590. Plaintiff was diagnosed with neck pain, tinea

versicolor, disc herniation, spina bifida, lumbar radiculopathy, and chronic back pain, radiating down both lower limbs with numbness over both big toes. A.R. 591. On April 30, 2012, Plaintiff's cervical spine MRI revealed small, broad-based bulging of the disc at the level of C5-C6 without stenosis. A.R. 491-93.

On June 14, 2012, Plaintiff complained of neck pain starting one month earlier, which he described as a "numbness" that begins in his neck and radiates medially towards his hands and upwards towards his head. A.R. 571-72. Plaintiff, in addition, reported that the numbness in his hands is worse whenever he raises them overhead. A.R. 572. Plaintiff's physical examination revealed that he was oriented in all three spheres, he had fluent speech, and he followed commands; he appeared pleasant, healthy, and he was not in any distress; his posture was symmetric and he was sitting comfortably; he was capable of standing without difficulty; he had full strength; he had a forward flexed neck and rounded shoulders; he had a non-antalgic gait; his Hoffman's reflex and Spurling's test were negative; and his neck extension, flexion, and rotation were all full and painless. A.R. 575. However, Plaintiff's neck side-bending was limited to 50% with neck "stiffness"; he showed some tenderness over his mid cervical parapspinals and posterior deltoids; his left straight leg raising test was positive for radicular symptoms; and he exhibited decreased sensation over all right fingers. A.R. 575-76. Plaintiff was ultimately diagnosed with neck numbness and tingling which radiated to his arms and face, lumbar radiculopathy, and possible thoracic outlet syndrome, as he exhibited weakness in his thumb abductors and decreased sensation in all right fingers during his physical examination. A.R. 576-77.

In October 2012, during a follow up at Sports Extra, Plaintiff was diagnosed with cervical radiculitis, neck pain, shoulder pain, and low back pain. A.R. 462-63. An injection to his left shoulder was administered. A.R. 463.

On October 23, 2012, during a follow up at the VA Hospital, Plaintiff complained of the following symptoms: lower back pain in the lumbar region radiating down the side of his legs and into his great toe bilaterally; (b) intermittent numbness and tingling in his legs; and (c) neck pain associated with bilateral shoulder, arm, hand, and face numbness, which started a few months earlier. A.R. 550. Although Plaintiff exhibited tenderness, his examination was otherwise normal: he was capable of moving all extremities; he displayed full range of motion; he had full strength; his sensation was intact; he was able to walk without assistance; his gait was normal; he had no edema, cogwheeline, fasciculations, pronator drift, or tremors; he was oriented in all three speheres; and his speech was fluent. A.R. 551. Plaintiff was diagnosed with lumbar radiculopathy and new onset neck pain associated with bilateral arm numbness. A.R. 552. Moreover, Plaintiff's electrodiagnostic evaluation was assessed as "normal," because "[t]he muscles examined revealed silence at rest with normal motor units and normal recruitment pattern." A.R. 549.

On both November 13, 2012 and January 24, 2013, during follow ups at the VA Hospital, Plaintiff was not in any acute distress; he appeared well; his shoulder and neck exhibited a full range of motion to forward flexion and extension; and he did not display any obvious muscle atrophy. A.R. 536-37, 544. However, he exhibited right deltoid tenderness to palpation at the insertion of the deltoid muscle. A.R. 536-37, 544. Plaintiff was diagnosed with chronic neck and low back pain. A.R. 544.

On January 29, 2013, Plaintiff returned to Sports Extra, and he was diagnosed with cervical and lumbar radiculopathy. A.R. 461.

On February 15, 2013, Plaintiff underwent a neurological examination at the VA Hospital, during which he displayed decreased sensation in his arms and legs; however, he was oriented in all three spheres, had good comprehension; his speech was fluent; he had full motor strength; his upper and lower extremities had normal tone with no muscle atrophy; he could ambulate normally; and he had intact tandem gait. A.R. 517. Moreover, Plaintiff's strength was "intact throughout" and his sensory examination findings and medical history were not consistent with any dermatomal or neurologic distribution. A.R. 519. His pain medication prescription was increased. A.R. 519.

In addition, notes from Plaintiff's physical examination indicate that he had previously fallen down the steps because his leg "gave up." A.R. 520. Nevertheless, he appeared well developed, well nourished, and not in any acute distress; he was oriented in all three spheres; his neck was supple; his upper and lower extremities were normal; he exhibited no back tenderness; his straight leg raising tests were negative and he had full range of motion; he displayed normal motor and sensory function; he was capable of moving all four extremities, standing, and walking; and his reflexes were normal. A.R. 523. Moreover, Plaintiff's lumbar spine MRI revealed grade 1 spondylolisthesis at L5-Sl with bilateral spondylolysis, small annular bulge, and bilateral neural foraminal stenosis. A.R. 619-21. Plaintiff was diagnosed with lower back pain. A.R. 524.

On March 14, 2013, Eric Freeman, M.D., evaluated Plaintiff due to complaints of low back pain and neck pain, in addition to upper and lower extremity numbness without footdrop. A.R. 685. During his physical examination, Plaintiff appeared to be in mild distress; he had a

reduced cervical and lumbar spine range of motion with tenderness to palpation but no atrophy; his straight leg raising tests were positive at 45 degrees; and he exhibited decreased sensation in his upper and lower extremities. A.R. 687-88. However, Plaintiff was oriented in all three spheres and cooperative; he was able to heel, toe, and tandem walk without the use of an assistive device; his Spurling's maneuver and Lhermitte's sign were negative; and he had full motor strength in his upper and lower extremities. A.R. 687-88. Plaintiff was provided with the following diagnosis: "bilateral lumbar radiculitis secondary to lumbar herniated nucleus pulposus with   annular tear at L4-L5," "cervical radiculitis secondary to cervical degenerative disc disease with associated   facet syndrome," in addition to "cervical and lumbar myofascial pain syndrome." A.R. 688.

On March 18, 2013, Plaintiff returned to the VA Hospital and reported that he had fallen while attempting to stand up from the couch due to his severe low back pain. A.R. 511. Plaintiff, in addition, complained of chronic numbness in his face, back of the head, arms, hands, legs, and feet. A.R. 511. Upon examination, Plaintiff appeared well and he was not in any acute distress; ultimately, Plaintiff was diagnosed with chronic neck and low back pain. A.R. 511.

On March 20, 2013 and May 24, 2013, Plaintiff received lumbar epidural injections from Dr. Freeman. A.R. 690-91. Moreover, on April 23, 2013, during a follow up with Dr. Freeman, Plaintiff complained of constant and sharp pain in the cervical and lumbar region radiating to the bilateral upper and lower extremities, accompanied with numbness, tingling, cramping, spasms, and burning. A.R. 692. Upon examination, Plaintiff was in mild distress; he had cervical tenderness to palpation with no atrophy and a mild reduction in range of motion; he had lumbosacral tenderness to palpation with no atrophy and a moderately reduced range of motion; his straight leg raising tests were positive at 45 degrees; however, he appeared well nourished,

well developed, and alert; he had no tenderness to palpation in his upper extremities; he had a normal range of motion and joint stability without pain in his shoulders, elbows, wrists, hips, knees, and ankles; he had no tenderness to palpation in his lower extremities; he had normal right upper extremity muscle strength and motor function; he had intact sensation in his upper and lower extremities; he had normal gait; he was able to stand without difficulty; and he was able to ambulate without an assistive device. A.R. 693-94. In addition, a mental assessment demonstrated that Plaintiff's judgment and insight were intact; his mood was normal; and his affect was appropriate. A.R. 694. Plaintiff was diagnosed with cervical radiculitis, lumbosacral radiculitis, and myofascial pain. A.R. 694.

On May 2, 2013, State agency medical consultant James Paolino, M.D., independently examined Plaintiff's medical records, and rendered an opinion as to Plaintiff's exertional limitations. A.R. 99. In doing so, he noted that Plaintiff could occasionally lift and/or carry up to 10 pounds, frequently lift and/or carry up to 10 pounds, stand and/or walk (with normal breaks) for a total of approximately 2 hours in an 8-hour workday, sit (with normal breaks) for a total of approximately 6 hours in an 8-hour workday, and can push and/or pull objects. A.R. 99. Furthermore, Dr. Paolino indicated that Plaintiff should never crouch, crawl, or climb ropes, ladders, and scaffolds; can occasionally climb ramps/stairs and kneel; and has no difficulty balancing. A.R. 100. Finally, Dr. Paolino determined that Plaintiff did not suffer from any manipulative, visual, communicative, or environmental limitations. A.R. 101. On July 25, 2013, Mary McLarnon, M.D., a second State agency medical consultant, independently reviewed Plaintiff's medical records and affirmed Dr. Paolino's findings. A.R. 110-12.

On May 21, 2013, during a follow up with Dr. Freeman, Plaintiff complained of constant and sharp pain in the cervical and lumbar region, radiating to the bilateral upper and lower

extremities, accompanied with numbness, tingling, cramping, spasms, and burning. A.R. 697. During an examination, Plaintiff appeared well nourished, well developed, alert, but in mild distress; he had cervical tenderness to palpation with no atrophy and a mild reduction in range of motion; he had lumbosacral tenderness to palpation with no atrophy and a moderately reduced range of motion; his straight leg raising tests were positive at 45 degrees; however, he had normal right upper extremity muscle strength, motor function, and intact sensation; he had normal gait; he was able to stand without difficulty; and he was able to ambulate without an assistive device. A.R. 698. In addition, Plaintiff's mental status exam demonstrated that his judgment and insight were intact; his mood was normal; and his affect was appropriate. A.R. 698. Plaintiff was assessed with cervical radiculitis and grade 1 lumbosacral radiculitis A.R. 698-99.

On June 27, 2013, during a follow up with Dr. Freeman, Plaintiff appeared well nourished and well developed, alert, but in mild distress; he had cervical tenderness to palpation with no atrophy; his cervical range of motion was mildly reduced; he had mild lumbosacral tenderness to palpation; he had normal lumbosacral range of motion; his straight leg raising tests were positive at 45 degrees; however, his upper and lower extremities were all normal with intact sensation; his right upper extremity strength and motor function were normal; his sensation was reduced in the distal extremities; he had normal gait; he was able to stand without difficulty; and he was able to ambulate without an assistive device. A.R. 701. Moreover, Plaintiff's mental status exam revealed that his judgment and insight were intact; his mood was normal; and his affect was appropriate. A.R. 701. Plaintiff was assessed with cervical radiculitis, lumbosacral radiculitis, and myofascial pain. A.R. 701-02.

On August 13, 2013, Plaintiff's cervical spine MRI showed a C3-C4 disc herniation mildly indenting the anterior thecal sac, a C4-C5 disc bulge, and a C5-C6 disc herniation with uncovertebral hypertrophy contributing to mild central canal and bilateral neural foraminal stenosis. A.R. 720. The medical notes indicate that Plaintiff's MRI findings slightly progressed since his prior exam. A.R. 720.

On September 24, 2013, Plaintiff was admitted to the emergency department at The University Hospital, where he was diagnosed with lower back pain, thoracic spine pain, degeneration of the lumbar or lumbosacral intervertebral disc, degeneration of the cervical intervertebral disc, and neck pain. A.R. 726. Plaintiff's lumbar spine x-ray revealed spondylolysis with grade 1 anterior spondylolisthesis of L5 on S1 with no acute fracture. A.R. 728. In addition, Plaintiff's cervical, thoracic, and lumbar spine MRI showed spondylolysis at L5 with approximately 6 millimeters of anterolisthesis of L5 on S1, multi-level degenerative changes resulting in central canal and neuroforaminal stenosis, an impingement of the right L5 nerve root in the neural foramen, and a small disc bulge at L4-L5 which contacts the descending right L5 nerve root without impingement. A.R. 732.

In a letter dated October 4, 2013, Antonios Mammis, M.D., indicated that Plaintiff first "developed severe pain of the head, low back, and bilateral lower and upper extremities" in 2011, and, in addition, although Plaintiff had received four epidural injections, they have not provided him with relief. A.R. 891. Dr. Mammis also described the results of Plaintiff's physical examination, during which he was not in any acute distress; he was pleasant and cooperative; his cranial nerve examination was within normal limits; he had normal bulk and tone; he had full muscle strength; and he had normal reflexes. A.R. 891. In his concluded remarks, Dr. Mammis diagnosed Plaintiff with neuropathic pain syndrome, most pronounced in his low back and

bilateral lower extremities with no true anatomic correlate, and indicated the he was referring Plaintiff to Anthony Sifonios, M.D. A.R. 892.

On October 4, 2013, Anthony Sifonios, M.D., began treating Plaintiff. A.R. 954. During a physical examination, Plaintiff appeared well developed and well nourished; his neck was supple but exhibited some possible mild muscle spasm; his back flexion was approximately 90 degrees while his back extension was about 10 to 15 degrees and caused pain; his lateral rotation to the right side produced significant pain; he exhibited tenderness to palpation overlying the right L4-L5 and L5-S1 facet joints; and he showed decreased sensation over the L5 dermatome. A.R. 954.

On December 5, 2013, Plaintiff received a facet joint injection. A.R. 786. On January 30, 2014, Plaintiff underwent nerve conduction testing at the Rutgers Neurological Institute of New Jersey, as a result of his chronic neck pain, numbness, tingling, and weakness in both upper extremities. A.R. 936. Specifically, Plaintiff's results revealed "neurophysiological evidence of left mild median nerve dysfunction of the wrist consistent with mild carpel tunnel syndrome." A.R. 936.

On February 20, 2014, during an appointment with the orthopedic department of The University Hospital, Plaintiff complained of cervical neck pain radiating to his arms, diffuse numbness across the chest and abdomen, and lumbar back pain radiating to his legs. A.R. 737. Plaintiff also reported that that he ceased driving because he is unable to maintain a seated position for a long duration, and that he prefers supine or semi-erect positioning. A.R. 737. Upon examination, Plaintiff exhibited full strength and a full cervical range of motion with minimal worsening pain and no tenderness to palpation; however, Plaintiff showed decreased sensation in his right arm, thorax, and right leg; he walked with a mild antalgic slow gait, although he was

capable of maintaining a heel and toe walk. A.R. 738. Plaintiff was ultimately assessed with right leg paresthesia, lumbar back and radicular pain, and possible thoracic syndrome based on the symptoms in his bilateral upper extremities. A.R. 738.

On March 28, 2014, during a follow up, Dr. Sifonios indicated that Plaintiff's prior "right-sided L3-L4, L4-L5 and L5-S1 diagnostic medial branch block" on December 5, 2013, provided him with an approximately 90% reduction of his low back pain. A.R. 950. Upon examination, Plaintiff was oriented in all three spheres and he appeared well developed and well nourished without any acute distress; his neck was supple; his back flexion was about 90 degrees; his straight leg raising tests were negative; and he had full motor strength in his upper and lower extremities. A.R. 950. However, his back extension was approximately 10 to 15 degrees and caused pain; he exhibited bilateral paraspinal lumbar muscle spasm with tenderness over the right L4-L5 and L5-S1 facet joints; and he had decreased sensation over the right L5 dermatome. A.R. 950 Ultimately, Dr. Sifonios diagnosed Plaintiff with chronic low back pain with bilateral radicular symptoms. A.R. 951.

On April 17, 2014, Plaintiff was examined by Dr. Sifonios for L5-S1 spondylolisthesis, and, at an outpatient assessment, Plaintiff had a normal physical screening, including an independent steady gait and an active range of motion; Plaintiff was also oriented in all three spheres; his speech was normal; and he was cooperative. A.R. 810.

On June 27, 2014, during his follow up with Dr. Sifonios, Plaintiff reported chronic low back pain with bilateral lower extremity radiculopathy and neck pain with radiculopathy. A.R. 946. Upon examination, Plaintiff appeared well developed, well nourished, and in no acute distress; his neck flexion was 90 degrees with an extension of 10 degrees; he exhibited full motor strength; his back flexion was approximately 90 degrees with an extension of 30 degrees; and he

had intact sensation in the upper extremities; however, Plaintiff's straight leg raising test was positive, and he exhibited decreased sensation in the right lower extremity. A.R. 946-47. Dr. Sifonios ultimately diagnosed Plaintiff with "chronic low back pain with radiculopathy secondary to grade l anterolisthesis of L5 on S1 as well as a pars defect resulting in radicular pain," in addition to "chronic cervical pain with radiation due to numerous disc bulges." A.R. 947.

On July 22, 2014, Plaintiff was admitted to the emergency department at The University Hospital, where he was diagnosed with nerve root disorder and prescribed pain medication. A.R. 743-44. Shortly thereafter, Plaintiff was provided with a cervical epidural steroid injection. A.R. 830-32.

On July 24, 2014, Plaintiff returned to The University Hospital, where he underwent an outpatient assessment. A.R. 881-82. Plaintiff's physical screening was normal, including an independent steady gait with an active range of motion; Plaintiff was also oriented in all three spheres; his speech was normal; and he was cooperative. A.R. 881.

On August 14, 2014, Michael J. Vives, M.D, examined Plaintiff, finding that he suffered from "a long history of both chronic neck and low back pain with radicular symptoms into bilateral arms and bilateral legs" and his multiple cervical and lumbar spine injections were "only minimally helpful." A.R. 920-21. Upon examination, Plaintiff's lumbar and cervical spine exhibited a decreased range of motion without any tenderness to palpation throughout the spine, and Plaintiff reported a decreased sensation primarily in in his right arm and leg; however, he had full strength in his arms and legs. A.R. 921. According to Dr. Vives, Plaintiff suffered from "long-standing chronic neck pain with radicular symptoms in bilateral arms, which has acutely

[gotten] worse and chronic low back pain radiating to bilateral legs, which continues to be the same." A.R. 921.

On August 21, 2014, Plaintiff's cervical spine MRI revealed a C3-C4 small disc herniation, mildly indenting the anterior thecal sac; C4-C5 and C5-C6 disc bulges; and straightening with loss of the normal cervical lordosis, possible due to positioning or muscle spasm. A.R. 942. On September 22, 2014, Plaintiff's right shoulder MRI showed infraspinatus and supraspinatus peritendinitis, in addition to mild degenerative changes of the AC joint. A.R. 941.

On September 9, 2014, Plaintiff visited Dr. Vives, during which he made the following determination:

> it has been difficult to really nail down the etiology of [Plaintiff's] symptoms as his previous MRI done of the cervical spine approximately a year ago showed an extremely small disc herniation that did not seem to correlate with the symptoms. He continues to complain of bilateral upper extremities and numbness in the back of head and that also includes the front of the face . . . . There is no significant change in his symptoms."

A.R. 982-83. In addition, a physical assessment demonstrated that Plaintiff had full arm strength with slightly decreased sensation; his biceps and triceps reflexes were normal; and he tested negative for Hoffman. A.R. 983. Dr. Vives also interpreted Plaintiff's 2014 cervical spine MRI which showed "a mild disc herniation at C3-C4 and also at C4-C5." A.R. 983. According to Dr. Vives, "[t]hese disc herniations are not causing any type of port impingement. They are vey mild in nature." A.R. 983. In his concluding remarks, Dr. Vives indicated that Plaintiff required a shoulder MRI. A.R. 983.

On December 4, 2014, Dr. Sifonios examined Plaintiff, who complained of bilateral arm pain, shoulder pain, chronic neck pain with bilateral lower extremity radicular symptoms and chronic low back pain with bilateral lower extremity radicular symptoms; however, he reported

that cervical epidural steroid injections helped alleviate his radicular arm symptoms. A.R. 944. Plaintiff's physical assessment revealed that he was oriented in all three spheres, and he appeared well developed and well nourished with no acute distress; he had full motor strength in his upper and lower extremities; his straight leg raising tests were negative; and his neck flexion was 90 degrees while his extension was 10 degrees; on the other hand, Plaintiff exhibited some tenderness to palpation on the posterior humeral head; Plaintiff showed some mild crepitus of the right shoulder, but with no AC joint impingement and a good range of motion. A.R. 944-45. Dr. Sifonios diagnosed Plaintiff with chronic neck pain and chronic back pain with shoulder pain. A.R. 945.

In a letter from December 18, 2014, Dr. Sifonios provided a summary of Plaintiff's reported symptoms, including neck pain, low back pain, and numbness throughout his entire body which gets progressively worse and radiates down both legs, but more severely on the right side. A.R. 971. However, notwithstanding Plaintiff's complaints of weakness in his legs, Dr. Sifonios indicated that he did not require an assistive device to ambulate during a prior office visit. A.R. 971. Dr. Sifonios, in addition, reviewed Plaintiff's MRI scans, which revealed the following diagnosis: "anterolisthesis of L5-S1" in the lumbar region; "some degeneration of his disk spaces, specifically at L4-L5 and L5-S1"; a disk bulge at L4-L5 which contacted the right L5 nerve root; some bilateral degenerative facet joint disease; and some mild spinal stenosis. A.R. 971. In his concluding remarks, Dr. Sifonios provided a summary of the procedures which Plaintiff received under his care, and determined that: "[d]ue to his low back pain as well as his spondylolisthesis, I do not recommend that Mr. Klein work where heavy lifting is required or bending or stooping." A.R. 972.

On April 24, 2015, Dr. Sifonios examined Plaintiff, during which he complained of cervicalgia, lumbago, sciatica, cervical radiculopathy, and occipital headaches. A.R. 977. However, Plaintiff indicated the he received a prior bilateral L5-S1 transforaminal epidural and a pars defect injection, resulting in significant pain relief for approximately six months. A.R. 977. Plaintiff's physical examination revealed the following results: he was oriented in all three spheres and he appeared well developed and well nourished and in no acute distress; his neck was supple and his extension was normal, although there were some taut muscle bands and his flexion was reduced and caused pain; his lumbar flexion was 90 degrees while his lumbar extension was about 25 degrees and caused pain; and he exhibited full motor strength without any motor deficits. A.R. 977-78. Moreover, according to Dr. Sifonios, Plaintiff "is suffering from occipital neuralgia as well as chronic low back pain with bilateral lower extremity radicular symptoms. He had an excellent response to previous L5·S 1 bilateral transforaminal epidural steroid injection as well as pars defect injection. He also suffers range of motion cervical radiculopathy and occipital neuralgia." A.R. 978.

In a letter from May 1, 2015, Dr. Mammis described Plaintiff as a 41-year-old man who suffered from chronic cervicalgia and lumbago, and, in addition, provided a summary of Plaintiff's complaints:

> [Plaintiff] states that both are equally bad and range from 8-10/10 on the visual analog scale and are burning, sharp, shooting and squeezing. The lumbago is not radiating into the lower extremities, but he states that the cervicalgia radiates into the arms and is associated with subjective weakness and numbness, dropping of items, difficulty in writing, difficulty in opening jars and performing tasks. He does describe bilateral lower extremity shooting pain and difficulty in balance and falls. He is no longer able to work. He is no longer able to care for his family and ambulates with a cane. He states that the rest partially alleviates the pain and any motion makes the pain worse

A.R. 984. Dr. Mammis also included the results of Plaintiff's physical examination, during which Plaintiff was tearful but oriented in all three spheres, and he exhibited full muscle strength. A.R. 984-85. According to Dr. Mammis's findings, Plaintiff had "cervicalgia, lumbago and sciatica with bilateral pars defect across L5, degenerative disc at L4-L5, L5-S1 and with greater than 3 mm of dynamic subluxation across L5-S1." In his concluding remarks, Dr. Mammis indicated that he recommend an anterior lumbar interbody fusion at L4-L5 and L5-S1. A.R. 985.

In a letter from August 14, 2015, Dr. Mammis indicated that Plaintiff had undergone an anterior lumbar interbody fusion at L4-L5 and L5-S1, and Plaintiff "did very well from the operation and is recovering nicely . . . . He described significant improvement in his pain, posture, and quality of life." A.R. 1011. Plaintiff's physical examination results were also described, during which he had full strength in all muscle groups, but diminished sensation in his right leg. A.R. 1011. Dr. Mammis, in addition, included the following remarks in his letter: "[o]verall we are extremely pleased with [Plaintiff's] progress." A.R. 1011.

On December 20, 2015, Plaintiff was admitted to the emergency department at The University Hospital, where he was diagnosed with neck pain, disturbance of skin sensation, and shoulder weakness. A.R 1010. Plaintiff was ultimately discharged in improved and stable condition. A.R. 1010.

On March 28, 2016, Plaintiff was evaluated at the VA hospital, during which he ambulated with a cane and complained of headache and sharp eye pain, hearing loss, left shoulder pain, and panic attacks which occurred over the past five years. A.R. 1036-37. Plaintiff also reported numbness from his head down "to under the nipples," and from his waist down to his toes. A.R. 1037. Upon examination, Plaintiff was alert and oriented; he had a non-tender

back; and his upper extremities were intact; however, he had decreased left hand grip strength; he had bilateral lower leg and foot weakness, with no drop; and his neck and shoulders exhibited a decreased range of motion. A.R. 1038. Plaintiff was ultimately diagnosed with chronic back pain. A.R. 1039.

On that same day, a mental health consultant examined Plaintiff at the VA Hospital, where he was evaluated for anxiety and panic attacks. A.R. 1032. Plaintiff denied being preoccupied with panic attacks and/or avoiding situations due to them, as well as feeling depressed. A.R. 1032. Although Plaintiff's mood was somber upon examination, he displayed appropriate behavior; he was appropriately dressed/groomed; was cooperative; his eye contact was fair; he was oriented in all three spheres; his affect was full; his speech was clear, coherent, and goal directed; he denied suicidal or homicidal ideation or intent; he did not display any evidence of psychotic symptoms; and his insight and judgment were adequate. A.R. 1035. Plaintiff was ultimately diagnosed with anxiety disorder due to chronic pain, with panic attacks. A.R. 1035.

On April 27, 2016, a staff psychiatrist evaluated Plaintiff at the VA Hospital. A.R. 1025. Plaintiff complained of poor sleep and ongoing, recurrent panic attacks, which were worse in public places. A.R. 1025. A mental status exam revealed as follows: Plaintiff's appearance was appropriate; he was cooperative and pleasant; his speech was normal; he displayed anxious mood; his affect was full; his thoughts were goal directed; he did not suffer from any delusions; his perceptual function was normal; he was oriented in all three spheres; his cognitive functions were intact; his insight was fair; and he had good judgment. A.R. 1026. Plaintiff was diagnosed with anxiety due to chronic pain. A.R. 1026.

On April 29, 2016, during a follow up at the VA hospital, Plaintiff reported that he no longer drove, but he was able to get out of the house for approximately ten to twelve hours and relies on his wife for transportation purposes. A.R. 1022. Upon examination, Plaintiff was alert and oriented; he had a non-tender back; and his upper extremities were intact; however, he had decreased left hand grip strength; he had bilateral lower leg weakness; he had foot weakness without drop; and his neck and shoulders exhibited a decreased range of motion. A.R. 1022. Plaintiff also indicated that he required help with his activities of daily living, and he has difficulty with buttoning his shirt. A.R. 1022. Plaintiff was ultimately diagnosed with chronic back pain. A.R. 1022.

### B.    Review of Testimonial Record

#### 1.    Plaintiff's Testimony

On October 21, 2014, Plaintiff appeared and testified at a hearing before the ALJ, A.R. 34-56, during which he testified about various matters, including his prior work experience, impairments, symptoms, and capacity to perform activities of daily living, as well as work-related tasks.

#### 2.    Testimony of the Medical Expert

At a supplemental hearing held on May 24, 2016, Ronald Kendrick, MD, testified as a medical expert before the ALJ. A.R. 62. Dr. Kendrick summarized Plaintiff's severe physical impairments, which included: (a) persistent pain due to some spinal degenerative conditions in the spine and a developmental condition, mainly spondylolisthesis at L5 and Sl; (b) L4, S1 fusion; (c) multilevel protrusions in the cervical spine with mild stenosis; (d) COPD; and (e) mild carpal tunnel syndrome on the left side. A.R. 63. According to Dr. Kendrick, however, Plaintiff's physical impairments did not meet or medically equal the severity of any listing,

specifically referencing 1.04A and C. In particular, Dr. Kendrick noted that Listing 1.04A required evidence of both motor loss and sensory loss, while 104C required evidence of ineffective ambulation. A.R. 64. However, notwithstanding Plaintiff's intermittent sensory changes, Dr. Kendrick determined that Plaintiff did not exhibit any motor loss functioning, and there was no medical necessity "from a functional or structural point of view for him to use a cane." A.R. 64.

In addition, Dr. Kendrick indicated that, while Plaintiff suffered from "mild carpel tunnel syndrome," that condition rarely requires surgery, but is treated instead with a prescription of wrist splints that maintain the wrist in a neutral position during sleep. A.R. 65. As to Plaintiff's COPD, Dr. Kendrick averred that it was "relatively mild." A.R. 66. Dr. Kendrick also stated that Plaintiff has "cervical issues." A.R. 67.

Moreover, Dr. Kendrick assessed Plaintiff's ability to perform various work related tasks, and he indicated that he would confine Plaintiff to sedentary work, which is comprised of occasionally lifting up to 10 pounds and frequently lifting negligible weight; standing and/or walking for a total of approximately 2 hours in an 8-hour workday; and sitting for a total of approximately 6 hours in an 8-hour workday. A.R. 67-68. Furthermore, Dr. Kendrick indicated that Plaintiff could occasionally use the stairs, bend, stoop, kneel, and crawl, but he should not climb ropes, ladders, and scaffolds, or work in high places or around dangerous moving machinery. A.R. 68. Dr. Kendrick also found that Plaintiff exhibited some manipulative limitations in his left upper extremities, such that he only possessed a "frequent use for fingering, and handling, and reaching." A.R. 67. And, to accommodate for Plaintiff's environmental limitations, Dr. Kendrick recommended that he "work in an environment of low concentrations of dust, fumes, and other pulmonary irritants." A.R. 68-69.

In response to a question from his attorney, Dr. Kendrick acknowledged that Plaintiff had nerve impingements; however, he explained that the nerves were not "impinged enough or constricted enough" such that Plaintiff exhibited a loss of motor function as defined within the meaning of Listing 1.04A. A.R. 70-71. Moreover, after Plaintiff's attorney referenced a letter from May 1, 2015, in which Dr. Mammis ostensibly indicates that Plaintiff is no longer able to work or care for his family, Dr. Kendrick emphasized that Dr. Mammis treated Plaintiff for a relatively brief period. A.R. 89-91. In addition, Dr. Kendrick indicated that Dr. Mammis performed a surgery on Plaintiff following that letter, subsequent to which Dr. Mammis opined that Plaintiff's condition was improving. A.R. 89-91.

### 3. Testimony of the Vocational Expert

Josiah Pearson also testified as a Vocational Expert ("VE") at the supplemental hearing held on May 24, 2016, before the ALJ. A.R. 78. The VE testified that Plaintiff's former job, as a greens keeper two, is a "semi-skilled" job with a "medium level" of exertion, associated with DOT # 406.683-010. A.R. 83. The VE also testified that Plaintiff's former job, as a produce stocker, is also a "semi-skilled" job with a "heavy level" of exertion, associated with DOT # 299.367-014. A.R. 83. Finally, the VE testified that Plaintiff's former job, as a produce manager, is a "skilled" job with a "medium level" of exertion, associated with DOT # 299.137-010. A.R. 83.

The VE was provided with two hypotheticals by the ALJ. The ALJ first posited the following:

> [A]ssume a hypothetical with the vocational profile of the claimant. Assume further that I find that he can do sedentary work. He can lift a maximum of ten pounds occasionally and negligible weight on a frequent basis, he can sit up to six hours, and stand and walk a total of two hours in an eight hour day. With his left upper extremity he can do frequent fingering, handling, and reaching, he can climb stairs occasionally, can do no ladders, ropes, or scaffolds, can work with no

contact with unprotected heights and no dangerous machinery. He can occasionally do bending, stooping, kneeling, and crawling, he can have occasional contact with high humidity, extremes in temperature, and undue amounts of dust or known pulmonary irritants. He can work in jobs where the routine does not change throughout the day, and can work in jobs that do not involve a lot of work-related decisions. Would -- would there be work -- well, could he do any of his past relevant work?

A.R. 84. The VE responded "[y]our Honor, past work would not be appropriate for an individual with this RFC." A.R. 84. However, when asked whether there were any sedentary occupations in the national economy that the hypothetical individual above could perform, the VE provided that such an individual could work in the following positions: order clerk, food and beverage, DOT # 209.567-014; document preparer, DOT # 249.587-018; and PC board inspector, DOT # 726.684-110. A.R. 84-85. The VE testified that these jobs, in the aggregate, are available in the amount of 128,262 nationally. A.R. 84-85.

The ALJ's second hypothetical was: "same as hypothetical number one, can do sedentary work but can sit for three hours and stand and walk a total of one hour in an eight hour day. Based on pain and psychiatric symptoms including frequent panic attacks and agoraphobia will be off task more than 15% of an eight hour day and will be absent more than three times a month. Would there be work that such an individual could perform?" A.R. 86-87. The VE responded that such an individual would not be able to find available work in national economy. A.R. 87.

C.    **ALJ's Findings**

The ALJ issued a written decision, following the hearing, on June 15, 2016. A.R. 18-26. The ALJ began by finding that Plaintiff met the insured status requirement of the Social Security Act to remain insured through December 31, 2016. A.R. 20. Next, the ALJ applied the standard five-step process to determine if Plaintiff had satisfied his burden of establishing disability. A.R.

20-26.

First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 9, 2011, the alleged onset date. A.R. 20.

Second, the ALJ found that Plaintiff had the following severe impairments: "anxiety/panic attacks with agoraphobia; traumatic arthritis of both shoulders; herniated discs back; stenosis; sciatica; cervical disc disease; blurry vision; asthma; and obesity." A.R. 20.

Third, the ALJ found that Plaintiff does not have an impairment, or a combination of impairments, that meets or medically equals the severity of one of the listed impairments under the Act that would qualify for disability benefits." A.R. 20-21. Specifically, in this step, the ALJ considered Plaintiff's psychological impairment under listing 12.06. A.R. 21. In that regard, the ALJ examined whether the "paragraph B" criteria of that listing was satisfied, finding that Plaintiff suffered only a "mild restriction" in activities of daily living; A.R. 21; "mild difficulties" or social functioning; A.R. 21; "moderate difficulties" for concentration, persistence, or pace; A.R. 21; and that Plaintiff has not experienced any extended durations of decompensation. A.R. 21. Accordingly, the ALJ found that the paragraph B criteria were "not satisfied" because Plaintiff's mental impairment did not cause "at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration." A.R. 21. The ALJ also considered the "paragraph C" criteria of listing 12.06 and found those criteria unsatisfied as well. A.R. 21.

Fourth, the ALJ found that Plaintiff had the residual functional capacity to perform as follows:

> [I]n an eight hour workday, sit up to six hours, stand/walk up to two hours and lift/carry up to ten pounds occasionally and negligible weight on a frequent basis. The claimant is able to do frequent fingering, handling and reaching with the left upper extremity; occasionally climb stairs; and never climb ladders, ropes or

scaffolds. The claimant is able to perform work involving no contact with unprotected heights and no dangerous machinery. The claimant is able to perform work involving occasional bending, stooping, kneeling and crawling; and occasional contact with high humidity, extremes in temperature and undue amounts of dust or known pulmonary irritants. The claimant is able to perform work jobs where the routine does not change throughout the day; and that do not involve a lot of work related decisions.

A.R. 21. In reaching this RFC determination, the ALJ considered Plaintiff's statements concerning his own limitations, relevant medical evidence concerning both his alleged physical and mental impairments, and medical source opinion evidence. A.R. 21. Specifically, the ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of such symptoms were not entirely credible, since they could not be corroborated by the relevant objective medical evidence. A.R. 21.

In that regard, the ALJ considered the results of Plaintiff's MRI in 2011, other clinical notes, and the medical procedures which were either recommended for, or performed on, Plaintiff. A.R. 22-24. The ALJ further considered the findings of Dr. Sifonios, Dr. Mammis, Dr. Ramos-Garcia, and Dr. Kendrick, who testified as a medical expert at a supplemental hearing held on May 24, 2016. A.R. 22. In particular, that ALJ noted that Dr. Kendrick testified that Plaintiff's impairments did not meet or equal the requirements of Listing 1.04(a) or (c), because there was no medical evidence of motor loss, and there was no medical evidence to support that Plaintiff required a cane to ambulate. The ALJ also noted that, according to Dr. Kendrick, Plaintiff's mild carpal tunnel syndrome was easily dealt with through the use of wrist splints while sleeping. A.R. 25.

Fifth, the ALJ found that, taking into consideration Plaintiff's age, education, work experience, and residual functional capacity, "there are jobs that exist in significant numbers in the national economy that the claimant can perform." A.R. 25. In reaching this determination,

the ALJ relied on the testimony of a vocational expert that an individual with Plaintiff's age, education, past relevant work experience, and residual functional capacity could perform the following representative occupations: Order Clerk, Food and Beverage DOT# 209.567-014; Document Preparer DOT# 249.587-018; as well as Print and Circuit Board Inspector DOT# 726.684-110, which the vocational expert testified existed in the national economy in the amounts of 46,935, 47,549, and 15,778, respectively. A.R. 26.

Accordingly, the ALJ concluded that "the claimant has not been under a disability, as defined in the Social Security Act, from November 9, 2011, through the date of this decision." A.R. 26.

## II.    STANDARD OF REVIEW

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*,

186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id.* at § 1382c (a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id.* at § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the

ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Id.* A claimant who does not have a severe impairment is not considered disabled. *Id.* at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id.* at § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id.* An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141. If the claimant is able to perform previous work, the

claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her previous work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146-47 n.5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled. *Id.*

## III. PLAINTIFF'S CLAIMS ON APPEAL

Plaintiff makes two arguments on appeal as to why the ALJ's disability determinations are unsupported by substantial evidence. First, Plaintiff argues that the ALJ failed to properly evaluate the medical evidence, including: (a) Plaintiff's orthopedic impairments which ostensibly meet or equal the criteria of Listing 1.04A; (b) the medical opinions of Dr. Sifonios and Dr. Mammis, both of whom allegedly opined that Plaintiff is unable to work; and (c) the side effects of Plaintiff's "potent pain medications" as is required under SSR 03-2p. Pl.'s Brief, at 21-29. Second, Plaintiff argues that the ALJ erred in his formulation of Plaintiff's RFC based on the following grounds: (a) he cannot perform sedentary work as he ambulates with a cane; (b) he failed to perform a function by function analysis as defined under SSR 96-8p; and (c) he did not provide the VE with a hypothetical which accurately described Plaintiff's exertional and mental impairments. *Id.*, at 29-25. The Court will address each argument in turn.

### A. The ALJ Properly Considered the Medical Evidence

*i.*      *Listing 1.04*

Plaintiff maintains that the ALJ erred at step three of the 20 C.F.R. § 404.1520 analysis, because he failed to conclude that his orthopedic impairments meet or equal Listing 1.04A. In *Burnett v. Commissioner of SSA*, 220 F.3d 112 (3d Cir. 2000), the Third Circuit held that an ALJ must provide an adequate explanation of his or her finding at step three, so that a reviewing court can engage in a meaningful judicial review. *Burnett*, 220 F.3d at 119-120. However, in *Jones v. Barnhart*, 364 F.3d 501, 505 (citing *Burnett*, 220 F.3d at 120), the Third Circuit adopted a more flexible approach, holding that "*Burnett* does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function of *Burnett* is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." In other words, "an ALJ need not specifically mention any of the listed impairments in order to make a judicially reviewable finding, provided that the ALJ's decision clearly analyzes and evaluates the relevant medical evidence as it relates to the Listing requirements." *Scuderi v. Comm'r of Soc. Sec.*, 302 F. App'x 88, 90 (3d Cir. 2008); *Ochs v. Comm'r of Soc. Sec.,* 187 F. App'x 186, 189 (3d Cir. 2006) ("[T]here is no requirement that the ALJ must identify or analyze the most relevant Listing.").

Here, the ALJ's decision, read in its entirety, indicates that the ALJ discussed the appropriate factors in determining that Plaintiff did not meet any of the listings, including Listing 1.04A. Listing 1.04A requires:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or

reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04. In his decision, the ALJ relied on the medical opinion of Dr. Kendrick, who testified at the supplemental hearing on May 24, 2016. *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) (state agency physicians are "highly qualified" and "experts" in social security disability evaluation.). Specifically, during the hearing, the ALJ inquired as to whether Plaintiff's "orthopedic issues" met or equaled Listing 1.04, to which Dr. Kendrick responded in the negative. A.R. 64. In support, Dr. Kendrick indicated that, notwithstanding the fact that Plaintiff exhibited "intermittent sensory changes," the medical record does not demonstrate that Plaintiff suffered from "any motor loss due to spinal cord impingement" as is required in order to satisfy the criteria of Listing 1.04. A.R. 64. Citing various portions of the record, the ALJ, in addition, independently found that "there was no evidence of motor loss" to warrant a finding of automatic disability under 1.04A. Indeed, the ALJ's determination is grounded in substantial evidence, as Plaintiff's physical examinations consistently revealed full muscle strength and motor functioning with no atrophy. A.R. 464, 466, 549, 544, 517, 600, 687-88, 693-94, 698, 701, 891, 972, 984-85, 1011. Therefore, because the ALJ discussed and contemplated the applicable elements under Listing 1.04, he did not commit reversible error in his decision.

## ii. *Medical Opinions*

Plaintiff argues that the ALJ failed to consider the opinions of Dr. Sifonios and Dr. Mammis, both of whom allegedly opined that Plaintiff is unable to work. Under 20 C.F.R. § 404.1527(c)(2), a treating source's opinion will be given controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Several factors may also be

used to determine the weight given to a medical opinion including: length of treatment relationship, the nature and extent of the treatment relationship, supportability by medical evidence, and consistency with the record as a whole. *Id*. If a treating source's opinion conflicts with that of a non-treating source, "the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reasons." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). That is, the ALJ must rely only on "contradictory medical evidence" in rejecting the treating source's opinion, rather than "credibility judgments, speculation or lay opinion." *Id*. An ALJ is required to provide "an explanation of the reasoning behind [his] conclusions," including "reason(s) for discounting rejected evidence." *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001).

Here, although Plaintiff maintains that the ALJ disregarded the opinions of the "specialists who opined that [he] could not work," including Dr. Mammis and Dr. Sifonios, neither of them rendered a determination to that effect. Rather, Plaintiff misconstrues the following portion of a letter from May 1, 2015, in which Dr. Mammis provides: "he states that the [cervicalgia] radiates into the arms and is associated with subjective weakness and numbness, dropping of items, difficulty in writing, difficulty in opening jars and performing tasks . . . . He is no longer able to work. He is no longer able to care for his family[.]" A.R. 984. The plain language of the letter demonstrates that Dr. Mammis was merely referring to Plaintiff's own representations during an office visit—the doctor, in his letter, was not providing an opinion as to whether Plaintiff was capable of working. Indeed, the alleged limitations are included after the words "he states," referring to Plaintiff. Nor did Dr. Sifonios indicate that Plaintiff's physical impairments prevented him from maintaining a job. In fact, in a letter from December 18, 2014, Dr. Sifonios advised that Plaintiff should only refrain from work which required "heavy lifting." A.R. 972. Significantly, the ALJ's RFC determination is consistent with that opinion as it

confines Plaintiff to sedentary work. Accordingly, the ALJ did not fail to consider the opinions of Dr. Mammis or Dr. Sifonios, neither of whom concluded that Plaintiff's physical impairments precluded his ability to work.[2]

### iii. Side Effects from Medication

Citing 20 C.F.R. §§ 404.1520(c)(3), 416.929(c)(3), and SSR 03-2p, Plaintiff avers that the ALJ "failed to even discuss, much less consider, the side effects from plaintiff's many medications on his ability to work as required by the Regulations." Pl.'s Brief, at 27. Specifically, 20 C.F.R. §§ 404.1520(c)(3) and 416.929(c)(3) set forth a list of factors which an ALJ may consider in determining the severity of a plaintiff's impairments and symptoms, one of which includes "[t]he type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms[.]" 20 C.F.R. §§ 404.1520(c)(3), 416.929(c)(3). Moreover, SSR 03-2p, in relevant part, provides as follows: "[c]hronic pain and many of the medications prescribed to treat it may affect an individual's ability to maintain attention and concentration[.]" *See* SSR 03-2P, 2003 SSR LEXIS 2 at *14.

Here, Plaintiff contends that his prescriptions include "powerful, potent medications," and he has received "multiple injections, multiple surgeries, radio frequency ablation, . . .

---

[2]     Plaintiff, in addition, argues that the ALJ improperly relied upon the medical opinion of Dr. Kendrick—the only physician who rendered an opinion with respect to whether Plaintiff was medically disabled. In support, Plaintiff contends that "Dr. Kendrick's opinion was "in contradiction of itself," because he inconsistently testified that while Plaintiff had "nerve impingement," he did not have a nerve that was impinged. Pl.'s Brief, at 25-26. In addition, Plaintiff maintains that Dr. Kendrick failed to account for Dr. Sifonios's representation that Plaintiff "is no longer able to work." *Id*. at 25. Plaintiff's position is wholly without merit. Indeed, as to his first argument, Plaintiff distorts Dr. Kendrick's representations by selectively quoting from his hearing testimony. Viewed in its entirety, Dr. Kendrick indicated that a nerve may be impinged without causing any loss in motor function; that opinion is not internally inconsistent. Moreover, as to Plaintiff's second argument, no treating physician opined that Plaintiff could not work, as discussed *supra*. Therefore, the ALJ did not err in this context by relying on Dr. Kendrick's opinion in his decision.

physical therapy, facet blocks, multiple procedures through UMDNJ, including 2 cages placed in back and a Mobi-C in his neck." Pl.'s Brief, at 27-28. However, notwithstanding the alleged extent of Plaintiff's medical treatment, he does not articulate any resulting side effects, nor does he cite to a medical document which reveals an adverse reaction to his prescribed medications that would result in a severe impairment. And, in addition, the Court's own independent review of the medical record reveals that Plaintiff did not experience or report any undesirable symptoms to his treating physicians, as a result of his prescribed medications. Therefore, in the absence of supporting evidence, Plaintiff's reliance on 20 C.F.R. §§ 404.1520(c)(3), 416.929(c)(3), and SSR 03-2p is misplaced. As such, there is no basis for finding reversible error. *Grandillo v. Barnhart*, 105 Fed. Appx. 415, 419 (3d Cir. 2004) ("[The Plaintiff] contends that the ALJ failed to take into account the adverse side-effects of [her] medication. But, as the government observes, the record is devoid of any evidence that [she] reported these adverse side-effects to her treating physicians.").[3]

### B. The ALJ Properly Determined Plaintiff's RFC

#### i. Cane Usage

---

[3]     The Court notes that Plaintiff only articulated a side effect during a hearing before the ALJ in 2014, at which he testified that "everything flares up" after receiving his epidurals "and it takes roughly a month to calm down if you do get any relief." A.R. 48. Notably, the ALJ expressly considered Plaintiff's epidural injections in his decision, noting that some provided him with "significant relief," and, in addition, the medical record does not indicate that Plaintiff's epidurals caused him to suffer from any adverse reactions. Indeed, notwithstanding the fact that Dr. Freeman treated Plaintiff with multiple epidurals, Plaintiff never reported any resulting side effects during their follow-up consultations. Accordingly, the ALJ was not required to accept Plaintiff's statements concerning the intensity of his alleged symptoms. *Nazario v. Berryhill*, No. 16-5483, 2018 U.S. Dist. LEXIS 186322, at *22 (D.N.J. Oct. 31, 2018) (finding that the ALJ did not err where the plaintiff's "only cites regarding her medications' side effects is her hearing testimony, and "[t]he remainder of the record contains evidence that contradicts Plaintiff's testimony about her side effects.").

Plaintiff contends that the ALJ's RFC determination is deficient, because it fails to account for his reliance on a cane to ambulate. Specifically, a claimant's "'residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999) (citing 20 C.F.R. § 404.1545(a)). In that connection, an ALJ will meet his obligation in rendering an RFC determination by "consider[ing] and explain[ing] his reasons for discounting all of the pertinent evidence before him in making his residual functional capacity determination." *Burnett*, 220 F.3d at 121. Therefore, "[i]n making an RFC determination, an ALJ must discuss both the evidence that supports his conclusion and the evidence that was rejected." *Garibay v. Comm'r of Soc. Sec.*, 336 F. App'x 152, 156 (3d Cir. 2009) (citing *Burnett*, 220 F.3d at 121; *Cotter v. Harris*, 642 F.2d 700 (3d Cir. 1981)). Otherwise, "in the absence of such [a discussion], the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705.

Here, the ALJ did not err in his RFC formulation by failing to account for Plaintiff's use of a cane. As the ALJ specifically acknowledged, Plaintiff's treatment records only indicate that he first used a cane in March of 2016, during an outpatient assessment shortly before the second supplemental hearing. In that connection, as a threshold matter, Plaintiff's limited cane use during a small fraction of the relevant time period falls significantly short of the twelve-month durational requirement. Specifically, as set forth in 20 C.F.R. §§ 404.1509 and 416.90, "[u]nless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at lease twelve months." *Evans v. Berryhill*, No. 16-749, 2019 U.S. Dist. LEXIS 22732, at *28 (D.N.J. Feb. 12, 2019) (concluding that the ALJ did not error where the plaintiff's use of a cane did not satisfy the twelve-month durational requirement); *Doherty v.*

*Comm'r of Soc. Sec.*, No. 11-03701, 2012 U.S. Dist. LEXIS 140329, at *34 (D.N.J. Sept. 12, 2012) (affirming the ALJ RFC's formulation because, "for nearly all of the time period at issue," the plaintiff "did not use a cane."). And, in addition to this temporal deficiency, Plaintiff fails to establish, nor does the medical record establish, that he was "medically required" to use a cane. *See, e.g.*, SSR 96-9p, 1996 SSR LEXIS 6, at *19 (a hand-held device will be found to be "medically required" where there is "medical documentation establishing the need" . . . and "describing the circumstances for which it is needed (*i.e.*, whether all the time, periodically, or only in certain situations[.]").

Indeed, Plaintiff's treating physicians did not issue a medical prescription for an assistive device for ambulation. To the contrary, the record only indicates that Plaintiff was observed using a cane by a medical practitioner, and such circumstances are insufficient to establish a medical necessity pursuant to the regulations. *See Zuna v. Colvin*, No. 15-1825, 2017 U.S. Dist. LEXIS 48035, at *50 (M.D. Pa. Mar. 3, 2017) ("[A]n observation that Plaintiff was using a cane is not equivalent to an opinion that she medically required a cane."); *see also, Starks v. Colvin*, No. 16-6062, 2017 U.S. Dist. LEXIS 146898, at *10 (E.D. Pa. Sept. 12, 2017) (holding that the ALJ did not err in omitting a cane requirement from the RFC assessment where there was "no evidence to support the claimant's allegation that he uses a doctor-prescribed cane."); *Doherty*, 2012 U.S. Dist. LEXIS 140329, at *34 (holding that the ALJ was not required to address the plaintiff's use of a cane in the RFC determination, because "the cane was not shown by any documentation to be medically required").

Notably, Dr. Kendrick, the only medical expert who rendered an opinion with respect to Plaintiff's need for a cane, ultimately concluded that "there's no medical necessity from a functional or structural point" which supports Plaintiff's reliance on an assistive device to

ambulate. And, in addition to the ALJ's reliance on Dr. Kendrick's testimony in his decision, the medical record includes a significant amount of physical examinations, during which Plaintiff either exhibited a normal or steady gait, or was capable of walking on his heels and toes. A.R. 512, 517, 523, 548, 551, 564, 575, 588, 600, 601, 605, 889, 924, 963, 995. Accordingly, the ALJ did not error by formulating an RFC which excluded Plaintiff's use of an assistive walking device. Rather, the medical record supports Plaintiff's ability to perform sedentary work, as the ALJ so found.[4]

    *ii.*       *SSR 96-8p*

In a conclusory fashion, Plaintiff also contends that the ALJ's RFC determination is in violation of SSR 96-8p. Pl.'s Brief, at 31. That is, Plaintiff maintains that the ALJ erred in his decision "by failing to focus on the plaintiff's ability to sustain work related activities." *Id*. Specifically, SSR 96-8p, in relevant part, provides as follows: "[i]n assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, for 5 days a week, or an equivalent work schedule) and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." *See* SSR 96-8P, 1996 SSR LEXIS 5, at *19.

Here, the ALJ met his obligation under SSR 96-8P in assessing Plaintiff's RFC. Specifically, based on his review of the record, the ALJ rendered a decision which described the maximum amount of various work-related activities that Plaintiff could perform during an eight-

---

[4]     The Court further notes that a claimant who ambulates with a cane is not automatically precluded from performing sedentary work. To the contrary, the regulations provide that, under certain circumstances, "the sedentary occupational base will not ordinarily be significantly eroded," notwithstanding a claimant's reliance on a medically required hand-held assistive device. SSR 96-9p, 1996 SSR LEXIS 6, at *19.

hour workday. These includes as follows: sitting for six hours; standing/walking for two hours; occasionally lifting up to ten pounds; frequently lifting negligent weight, and fingering, handling, and reaching with the left upper extremity; occasionally climbing stairs, bending, stooping, kneeling, crawling, and coming into contact with humid or extreme temperatures; and never climbing ladders, ropes, or scaffolds. A.R. 21. Significantly, the ALJ considered the relevant portions of the medical record in his decision, as well as Dr. Kendrick's medical testimony in setting forth those restrictions—the only medical expert who provided a function by function analysis with respect to Plaintiff's ability to perform various work-related tasks. Indeed, Plaintiff does not identify one treating physician whose opinion conflicts with Dr. Kendrick's findings, nor does the Court's own independent review of the record demonstrate as such. In fact, Dr. Sifonios, the only other physician to express a general opinion with respect to Plaintiff's ability to work, merely advised against performing a job which required "heavy lifting." A.R. 972. Clearly, the ALJ's RFC assessment is aligned with Dr. Sifonios's determination.

Nevertheless, in lieu of medical opinion evidence, Plaintiff primarily relies on his own complaints of chronic numbness in his arms/hands, and a diagnosis of mild carpel tunnel syndrome in his left wrist. However, these grounds fail to provide a basis for determining that the ALJ violated SSR 96-8P, because he specifically accounted for those impairments by limiting Plaintiff's performance of the following work-related tasks with his left upper extremity: fingering, handling, and reaching. Moreover, that determination is supported by Dr. Kendrick who opined that Plaintiff could perform as such, and testified that "mild carpel tunnel syndrome rarely requires any surgical treatment"; rather, it "usually dealt primarily by a prescription of wrist splints that maintain in the neutral position during sleep. Their symptoms primarily disturb their sleep." A.R. 66-67. Accordingly, Plaintiff's reliance on SSR 96 does not demonstrate that

the ALJ erred in his formulation of Plaintiff's RFC. *Reddell v. Comm'r of Soc. Sec.*, No. 15-00044, 2017 U.S. Dist. LEXIS 43320, at *15 (D.N.J. Mar. 22, 2017) (finding that the ALJ performed the function by function analysis as contemplated by SSR 96, where he accounted for the plaintiff's physical impairments because the RFC included temporal and weight restrictions with respect to the plaintiff's ability to sit, stand, lift, and carry).

> iii.    *The ALJ's Hypothetical Questions*

Finally, Plaintiff argues that the ALJ erred, because he failed to properly account for Plaintiff's limitations in his first hypothetical to the VE, which did not "include [P]laintiff's dependence on a cane for ambulating and balance" or "mental limitations." Pl.'s Brief, at 34-35. The Third Circuit has held that, "[w]hile the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984). However, *Podedworny* does "not require an ALJ to submit to the vocational expert every impairment alleged by a claimant," but rather only those limitations which are "medically supported and otherwise undisputed by the record. *Rutherford v. Barnhart*, 399 F.3d 545, 554 (3d Cir. 2005).

Here, for reasons already stated, the ALJ did not err by omitting Plaintiff's cane usage in his hypothetical to the ALJ. Nor was the ALJ required to include any psychological limitations as Plaintiff's mental status examinations were generally normal. A.R. 517, 523, 526, 547, 575, 639, 649, 657, 678, 1026, 1029. Accordingly, Plaintiff fails to articulate a medically supported and otherwise undisputed medical impairment, such that the ALJ was required to incorporate it into his hypotheticals.

**IV.    CONCLUSION**

For the reasons set forth above, I find that the ALJ's decision was supported by substantial evidence in the record. Accordingly, the ALJ's decision is affirmed. An appropriate Order shall follow.

/s/ Freda L. Wolfson
Freda L. Wolfson
United States District Judge
